UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| BETTY ROBISON, an individual, | ) | CV 07-4862 SVW (JCx) |
| RUSSELL AUSTIN, a | ) | |
| representative of the ESTATE OF | ) | ORDER GRANTING IN PART AND |
| MARY AUSTIN | ) | DENYING IN PART DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT |
| Plaintiffs, | ) | [34] |
| | ) | |
| v. | ) | |
| | ) | |
| AMCAL WOOD RANCH FUND XXXVII, a | ) | |
| California Limited Partnership; | ) | |
| AMCAL MULTI-HOUSING, INC., | ) | |
| General Partner of AMCAL WOOD | ) | |
| RANCH FUND XXXVII, Limited | ) | |
| Partnership; JOHN STEWART | ) | |
| COMPANY; SHARON BROWN | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |


I.  **INTRODUCTION**

     Russell Austin, as representative of the Estate of Mary Austin,

and Betty Robison ("Plaintiffs"), brought the instant action seeking

recovery under the Fair Housing Amendments Act ("FHAA"), the

California Fair Employment and Housing Act ("FEHA"), the Unruh Civil

Rights Act of California ("Unruh Act"), and the Federal

Rehabilitation Act.  (Compl., at 12-17.)  On April 14, 2008,
Defendants Amcal Wood Ranch Fund, John Stewart Company, and Sharon
Brown ("Defendants") brought this Motion for Summary Judgment.  For
reasons set forth below, Defendants' Motion is GRANTED with respect
to Plaintiffs' claims under 42 U.S.C. § 3604(c) and the
Rehabilitation Act.  Defendants' Motion is DENIED with respect to
Plaintiffs' claim for violation of the FHAA based on Defendants'
failure to make reasonable accommodations.

## II.  FACTS

    Mary Austin ("Mary") became a resident of Sorrento Villas on
November 16, 2006, and lived there until she passed away on October
19, 2007.  (Brown Decl., at 2.)  Mary was diagnosed with terminal
lung cancer in February 2007.  (Okojie Decl., Ex. A ("Robison Aff."),
at 2.)  Mary began chemotherapy in March 2007, and was placed under
the pallative care program provided by the Kaiser Foundation
Hospitals.  (Id.)  As a result of the chemotherapy, Mary was in a
weakened condition and not able to care for herself.  (Id.)  Mary's
doctors prescribed 24 hour in-home care for the first few weeks after
chemotherapy to help Mary with her daily needs.  (Id. at 3.)  Mary's
family members created a schedule where one of them could be with her
at all times.  (Id.)  Unfortunately, Mary's condition worsened
throughout the summer of 2007, and as a result, the 24 hour in-home
care continued.  (See id., Ex. 4.)

    Defendant Sharon Brown ("Brown") was the property manager at the
Sorrento Villas Senior Apartment Homes during the relevant time.

2

(Brown Decl., at 1.)  Brown's responsibilities included overseeing operations of the property, collecting rent payments, and processing applications for new residents.  (Id.)

Plaintiff Betty Robison ("Robison") is Mary's daughter. (Robison Aff., at 2.)  Robison alleges that she first informed Brown of her mother's condition in the middle of March, 2007.  (Id.) Robison says that she met with Brown in the Sorrento Villas parking lot and personally informed Brown that certain family members had set up a schedule to provide care for Mary.  (Id. at 3.)  Robison told Brown that family members would be driving long distances to care for Mary, and asked Brown whether management to allow them to stay overnight with Mary.  (Id.)  Robison recalls Brown saying that overnight guests would not be a problem, and to put everything in writing so that Brown would know what was going on.  (Id.)  Brown makes no mention of the parking lot meeting with Robison.  Instead, Brown declares that she first learned of Mary's condition in mid-March via a conversation with Mary.  (Brown Decl., at 5.)

On March 27, 2007, Robison wrote a letter to Brown, allegedly memorializing the matters they had spoken about in the parking lot. (Robison Aff., at 3.)  The letter begins: "Per your request, this letter is meant to explain the need for my mom, Mary Austin . . . , to have care temporarily."  (Okojie Decl., Ex. 1.)  It goes on to explain that Mary was recently diagnosed with lung cancer and that she would be undergoing chemotherapy treatments.  (Id.)  The letter states that "the family is supporting her and coming from great distances to help," and that "some of us will be spending the night with her depending on her needs and the distances we have traveled."

(Id.)  The letter lists four people who will be involved in Mary's care: (1) Russell Austin, (2) Barbara Fisher, (3) Betty Robison, and (4) Maria Robles.  (Id.)  Robison states that the family "hope[s] that this will be a short term situation," but that Mary may need radiation, which would be "six to eight weeks, five days a week." (Id.)  The letter also states that Robison would keep the management apprised of the situation, and requested that management call her if any questions arose.  (Id.)

Also on March 27, 2007, Brown claims that she called Mary's unit to talk about the overnight stays and parking traffic that she had noticed coming and going from the unit.  (Brown Decl., at 5.) Robison answered the phone and informed Brown that Mary was too ill to speak.  (Id.)  Brown says that she explained her concerns with the number of overnight guests, the visitors parking in unauthorized parking spaces, and the visitors not registering with the manager's office.  (Id.)  Brown states that Robison did not ask for an accommodation from the parking or overnight rules at this time. (Id.)  Robison denies that this conversation ever took place. (Robison Aff., at 5.)

A couple weeks after March 27, 2007, Brown sent a letter to Mary's unit requesting an inspection of the unit.[1]  (Id. at 3.) Robison states that Mary's hospice care nurse was concerned that the inspection would disrupt Mary's treatment and would be unnecessarily stressful.  (Id. at 4.)  Robison then wrote to Brown requesting that

---

[1]  Brown claims that she sent this letter to all the residents on April 26, 2007, requesting an inspection.  (Brown Decl., at 6.)  However, the note from Dr. Rosen sent in response was dated April 23, 2007. (Okojie Decl., Ex. 2.)

the inspection be cancelled.  (Id.)  Robison included a note and business card from Dr. Romina Rosen.  (Id.)  The note says "Mrs. Austin is on palliative care with Kaiser – please call (818) 802-7422 if questions."  (Okojie Decl., Ex. 2.)  Robison personally delivered this note Brown on April 26, 2007.  (Robison Aff., at 4.)

After receiving the doctor's note on April 26, 2007, Brown called Mary's unit.  (Id.)  Robison answered the phone and told Brown that Mary was too ill to speak to her.  (Id.)  Robison says that Brown demanded a date to perform the inspection.  (Id.)  The inspection was postponed until July 2007.  (Brown Decl., at 6.)

During this same time, Mary's guests and caretakers incurred multiple parking violations.  (Robison Aff., at 5, 7; Brown Decl., 7.)  Street parking was not allowed within approximately two and a half miles of Sorrento Villas.  (Robison Aff., at 5.)  On April 29, 2007, Brown saw three unauthorized vehicles parked in the spots designated for visitors as well as in the fire lane.  (Brown Decl., at 6.)  Violation stickers were posted on the cars of Mary's bathing aid, the hospice nurse, and other family members who were caring for Mary.  (Robison Aff., at 5.)  Brown also "tagged" cars on July 5 and 6, 2008.  (Brown Decl., at 6.)

Robison also alleges that Brown and the management of Sorrento Villas changed a common parking area to a no parking zone.  There was a space near Mary's apartment where a sign was posted stating: "No parking: Monday or Thursday for trash pickup."  (Robison Aff., at 5.)  Robison claims that it was common for residents of the complex to park there on days other than Monday or Thursday.  (Id.)  However, in late April, the complex management spray-painted the sign so that it

read only: "No parking." (Okojie Decl., Ex. 3.) Complex management claims that the curb was always red and that no parking was ever allowed in that location. (Reply, at 4.)

In late April 2007, Robison contacted a social worker from Kaiser, Benjamin Wheeler, to help intervene with Sorrento Villas on Mary's behalf. (Robison Aff., at 5.) On April 30, 2007, Wheeler placed a phone call to Brown to discuss the family's need for a live-in caregiver and the use of a dedicated parking space in the apartment complex. (Id. at 5.) Brown acknowledges that this conversation took place, but states that Wheeler did not provide Brown with documentation from Mary's lawyer stating that Mary needed special accommodations. (Brown Decl., at 6.)

On May 1, 2007, Wheeler visited the Sorrento Villas complex to speak with Brown in person. (Id.) Wheeler delivered a letter to Brown from Dr. Rosen, dated May 1, 2007, which states:

> This letter shall serve as verification that Mary Austin is presently under the care of Kaiser's Palliative care program. Due to her present medical condition, patient, Mary Austin, requires 24 hour caregiver assistance and monitoring. Should you have any questions regarding this requirement please feel free to contact me at (818) 832-7383.

(Okojie Decl., Ex. 4.) Brown claims that Wheeler did not provide her with documentation from Mary Austin's physician stating that Mary needed special accommodations. (Brown Decl., at 6.) Wheeler stopped by Mary's unit the next day, May 2, and dropped off a copy of Dr. Rosen's letter that Wheeler had just delivered to Brown. (Robison Aff., at 6.)

Wheeler prepared a letter on July 19, 2007, summarizing his conversation with Brown that occurred in early May.  Wheeler states that he spoke with Brown at that time to "verify [Mary's] need for 24 hour caregiver assistance and monitoring and offer to help mediate between Sharon [Brown] and Mrs. Austin's caregiver[s] if necessary." (Okojie Decl., Ex. 11.)  The letter states how Wheeler addressed Brown's concerns with the parking situation:

> I acknowledged the challenging parking situation and stated that if street parking were allowed in the area, I would gladly request that our staff park on the street when visiting Mrs. Austin but that regrettably, street parking is not allowed anywhere near the complex.  I explained that our staff wanted to know how we could have as little negative impact on the incredibly limited parking situation as possible.  I suggested to Sharon [Brown] that perhaps Sorrento Village consider assigning a parking space to Mrs. Austin to give her caregiver/medical team a place to park that would not impact other residents.  She responded that that was an interesting idea and she would discuss it with her supervisor.  I also explained that the family members providing her care understood the parking concerns and had already taken steps to limit themselves to one car on the property at a time to ease the impact on other residents.

(Id.)  Regarding the overnight guest problem, Wheeler wrote:

> I explained that there was no evidence that anyone other than Mrs. Austin resided in the unit. . . .  There are no signs of boxes or suitcases as though someone has moved in and brought

their belongings. . . .  Finally I pointed out that everyone who
comes during their shift to monitor and help Mrs. Austin has
their own residence and lives somewhere else.

(<u>Id.</u>)  Wheeler told Brown that Mrs. Austin's caregivers wanted to do
everything possible to comply with the rules if Brown would just tell
them what rules they were violating.  (<u>Id.</u>)  Brown said that she
would talk to her supervisor, and draft a letter explaining what
rules had been broken and what could be done to fix them.  (<u>Id.</u>)
Wheeler never received such a letter from Brown or her supervisors.
(<u>Id.</u>)  Brown disputes Wheeler's account of their conversation.
(Brown Decl., at 7.)

On July 13, 2007, attorneys for Sorrento Villas sent a letter to
Mary.  (Robison Aff., at 6.)  The letter informed Mary that she was
in breach of her lease agreement.  (Okojie Decl., Ex. 5.)  It notes
the following violations: (1) overnight guests not registering with
the office, (2) overnight guests accumulating more than 14 days in
the year, (3) violation of parking rules by failing to register with
the office, (4) monopolizing visitor parking spaces, and (5) parking
in fire lanes.  (<u>Id.</u>)  It states that "[m]anagement will no longer
tolerate continued violations of your lease agreement." (<u>Id.</u>)  The
letter recommended that "continued breaches of the agreement be
remedied or that the procedure to relocate to a different facility
begin in order to respect the rights and interests of other . . .
residents." (<u>Id.</u>)

Robison claims that there never was any requirement that
visitors register with the office when visiting tenants in the
complex.  (Robison Aff., at 7.)  Instead, Robison alleges that the

requirement of registering was imposed only on Mary's caregivers. (Id.)

Defendants' lawyers also contacted the Area Housing Authority ("AHA") regarding Mary's alleged violations of the lease. (Id. at 7.) On July 16, 2007, an official from the AHA called Mary's unit to complain that Mary was in violation of Section 8 housing rules for allowing unauthorized residents to live in the apartment. (Id.) Robison denied these allegations and informed the AHA that the people at the apartment were caregivers, providing the 24 hour care prescribed by Mary's doctors. (Id.) The AHA official instructed Robison to write a letter to the agency addressing Defendants' allegations. (Id.) Robison did so in a letter dated July 11, 2007, recounting the events listed here in detail. (Okojie Decl., Ex. 6.)

On July 16, 2007, Brown posted a warning notice on Mary's door. (Brown Decl., at 7.) The notice states:

> Continued violation of lease agreement – unauthorized people in residence and overnight parking of white van in visitor space w/o office permit. This serves notice that: vehicle is scheduled to be towed after 10 pm on 7/16/07. No unauthorized people in residence as of this date.

(Okojie Decl., Ex. 7.)

In response, Robison wrote a letter to Brown dated July 16, 2007. (Robison Aff., at 7.) It reiterated that a person was in the unit providing care for Mary, 24 hours a day, 7 days a week. (Okojie Decl., Ex. 8.) It states that "if this person is forced from the property or their vehicle is towed, Mary Austin will be deprived of the care she requires including the possible need to be transported

for medical reasons." (<u>Id.</u>)  It warns Brown that she will be endangering Mary's health if such actions are taken. (<u>Id.</u>)  The car was never towed.  (<u>Id.</u>)

On July 17, 2007, Defendants lawyers responded with another letter to Robison. (Robison Aff., at 8.)  This letter instructed Robison to conduct all future correspondence with the lawyers, not Brown.  (<u>Id.</u>)  It also stated that "[f]ailure to follow this procedure will result in steps being taken to terminate the tenancy." (Okojie Decl., Ex. 9.)

On July 19, 2007, Robison obtained from Dr. Rosen another memo describing the need for 24 hour care and faxed it to Defendants' lawyers. (Robison Aff., at 8.)  That letter stated that "Mrs. Austin's health has further declined and on June 7th Mrs. Austin was transferred to [the Kaiser] hospice program." (<u>Id.</u>)  It further said that Mary "is required to have a caregiver with her at all times" since she "can not safely care for herself given her present condition." (<u>Id.</u>)  Dr. Rosen also referenced his April 23, 2007, letter to the Sorrento Villas management verifying that Mary required 24 hour care. (<u>Id.</u>)  He noted that he included his contact information but never received a call from Defendants. (<u>Id.</u>)  Dr. Rosen also recounted how he instructed Wheeler to meet with Brown to address the situation back in May. (<u>Id.</u>)  Dr. Rosen included with his letter Wheeler's aforementioned summary of the conversation with Brown. (Okojie Decl., Ex. 11.)

On July 23, 2007, an inspection request was again posted on Mary's door. (Robison Aff., at 9.)  Robison then wrote another letter to Brown requesting that the management postpone the

inspection.  (Id.)  Robison also contacted the Fair Housing Council, which sent a letter to Sorrento Villas on July 23, 2007, requesting that the complex waive the parking and overnight guest requirement. (Id.)

On July 27, 2007, Plaintiffs Betty Robison and Mary Austin filed this action in federal court. (Cole Decl., at 2.)  That same day, Defendants' lawyers offered Mary's caregivers the permanent use of a visitor parking space. (Id.)  On August 1, 2007, Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order. (Id.)  At the hearing on August 6, 2007, the parties reached an agreement giving Plaintiffs exclusive use of one of the visitor parking spaces. (Id.)

As a result of Defendants' actions, Plaintiffs alleged that they experienced continuing anxiety, stress, and fear that Mary would be evicted from her apartment. (Robison Aff., at 7-8.)  Robison further alleges that her mother was aware of the ongoing conflict and that Robison saw Mary suffer from sadness, anxiety, and stress, while her condition was worsening. (Id. at 8.)  Mary ultimately passed away on October 19, 2007. (Id. at 2.)  Her son, Russell Austin as representative of the Estate of Mary Austin, was substituted as a plaintiff by joint stipulation on February 19, 2008. (Docket No. 33.)

///

///

///

///

///

11

III.  **ANALYSIS**

    A.  **Legal Standard**

    Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Tarin v. County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997).

    The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex Corp v. Catrett, 477 U.S. 317, 323-24 (1986).  That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  See id. at 323-34; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1968). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000). Only genuine disputes – where the evidence is such that a reasonable jury could return a verdict for the nonmoving party – over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  See Anderson, 477 U.S. at 248; Aprin v. Santa Clara Valley Transp. Agency, 261 F.3d

912, 919 (9th Cir. 2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

**B.  Standing**

As an initial matter, Defendants' assert that Plaintiffs Betty Robison and Russell Austin do not have standing to bring an action under the FHAA because Plaintiffs are not disabled and have not sustained an actual injury from an alleged discriminatory housing practice.  (Mot., at 10.)

**1.  Betty Robison**

The FHAA allows any "aggrieved person" to bring a civil action. 42 U.S.C. § 3613(a)(1)(A).  The definition of "aggrieved person" is broad and includes anyone who "claims to have been injured by a discriminatory housing practice."  Id. § 3602(i)(1).

Congress has expanded standing under the FHAA to the full extent of Article III.  Halet v. Wend Inv. Co., 762 F.2d 1305, 1309 (9th Cir. 1982).  Indeed, under the FHAA, a plaintiff need not allege that he or she was the direct victim of discrimination.  Harris v. Itzhaki, 183 F.3d 1043, 1050 (9th Cir. 1999); see also San Pedro Hotel., Inc v. City of Los Angeles, 159 F.3d 470, 475 (9th Cir. 1998) ("The Supreme Court has long held that claims brought under the Act are to be judged under a very liberal standing requirement.").  The only requirement for standing under the FHAA is the minima of injury-

in-fact as set forth in Article III of the Constitution.  <u>Harris</u>, 183
F.3d at 1050.  To meet this requirement, a plaintiff need only allege
that as a result of the defendant's discriminatory conduct, he or she
has suffered a distinct and palpable injury, regardless of whether
the plaintiff was the target of the discrimination.  <u>Id.</u>; <u>see also</u>
<u>Halet</u>, 672 F.2d at 1309 (noting that a plaintiff is allowed to assert
the rights of another so long as the plaintiff has suffered an
injury).

Here, Robison alleges that she was subjected to manipulative and
harassing treatment in her efforts to care for her mother.  (Opp'n,
at 17.)  Defendants ticketed and allegedly threatened to tow
Robison's car.  Furthermore, because there was no street parking
available within a two and a half mile radius, Robison and other
caretakers were forced to shuttle their cars several miles to and
from Sorrento Villas.  (<u>Id.</u> at 9.)  Robison was also continually
responding to management's phone calls and letters threatening legal
action for the overnight guests.  (Robison Aff., at 4, 7.)  This
caused Robison anxiety, stress, and frustration, and she was unable
to focus on the care of her mother.  (<u>Id.</u> at 9.)  Given these facts,
the Court finds Robison's injury sufficient under the FHAA's liberal
standing requirement.


        **2.  Russell Austin**


    Russell Austin was substituted in the place of his mother Mary
Austin after she passed away in October 2007.  Russell was
substituted in his role as representative of the Estate of Mary

Austin, not in his personal role.  Thus, Russell asserts the claims that Mary Austin had before she passed.  See Cal. Civ. Proc. Code § 377.34.

Defendants argue that Russell Austin is not a proper plaintiff because his substitution was improper.  (Mot., at 11.)  The Court finds no merit in this argument, however, because the parties stipulated to Russell's substitution after Mary passed away in October 2007.  (Docket No. 27.)  The Court approved their stipulation on February 19, 2008.  (Docket No. 33.)  Thus, it is too late in the day for Defendants to object to Russell's participation in this matter.

Russell's participation is proper given that an FHAA claim can be maintained on behalf of the estate when an individual who would have been a proper plaintiff dies in the course of litigation. Ambruster v. Monument 3: Realty Fund VII Ltd., 963 F. Supp. 862, 865 (N.D. Cal. 1997).  In Ambruster, the court held that under the FHAA, a claim for emotional distress damages survives the death of a plaintiff and can be maintained pursuant to California's survival statute.  Id.  The court further held that the survival statute's limitation on pain and suffering damages does not apply because the limitation conflicts with federal law.  Id. at 866.  Defendants do not contend that Mary Austin would not have had standing had she survived.  Thus, Russell Austin can maintain Mary Austin's claim as representative of her estate.

///

///

///

15

### C.  Violation of 42 U.S.C. § 3604(c)

Plaintiffs assert that Defendants violated 42 U.S.C. § 3604(c), which makes it unlawful "to make, print, or publish, or cause to be made, printed, or published any notice, statements or advertisement, with respect to the sale or rental of a dwelling that indicates preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination."  This provision governs written or oral notices or statements by a person used with respect to the sale or rental of a dwelling.  See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1164-65 (9th Cir. 2008); Housing Rights Ctr. v. Donald Sterling Corp., 274 F. Supp. 2d 1129, 1137 (C.D. Cal. 2003).

Defendants argue that this is not a proper cause of action because the policies governing the apartment complex are intended to facilitate a fair and safe method of distributing limited parking spaces and ensuring enforcement of the lease agreement.  (Mot., at 11-12.)  In order to make out a claim for violation of § 3604(c), a plaintiff must prove that the landlord or housing manager's statements would discourage an ordinary reader of a particular protected group from applying for an apartment.  Housing Rights Ctr., 274 F. Supp. 2d at 1137-38.  In their Opposition, Plaintiffs do not reassert this claim, suggesting that they have conceded this point.  Even if Plaintiffs do not concede this point, however, the alleged discriminatory parking and overnight guest rules established by the Defendants do not relate in any way to the sale or rental of a

dwelling, nor to the advertising of the sale or rental of a dwelling. As Plaintiffs fail to present any allegations or any evidence relating to this cause of action, summary judgment is proper.[2]

## D.  Reasonable Accommodations

Plaintiffs' second claim is that Defendants discriminated against them on the basis of a handicap in violation of 42 U.S.C. § 3604(f)(3)(b), when Defendants refused Plaintiffs' requests for reasonable accommodations. (Opp'n, at 20.)  Plaintiffs allegedly sought two types of accommodations: (1) that Defendants make an exception from the apartment complex's parking policy by giving Mary's caretakers a permanent parking space, and (2) that Defendants exempt Mary and her caregivers from the overnight guest policy. (See Opp'n, at 3, 7.)  Defendants argue that Plaintiffs were not prevented from providing care to Austin and, therefore, Austin was not deprived of the use and enjoyment of her dwelling.  (Mot., at 15.)

_____

[2] Plaintiffs also bring a claim under § 12855(c) of California's Fair Employment and Housing Act, which states that it is unlawful "for any person to make, print, or publish . . . any notice, statement, or advertisement, with respect to the sale or rental of a housing accommodation that indicates any preference, limitation, or discrimination based on . . . disability or an intention to make that preference, limitation, or discrimination."  Cal. Gov't Code § 12855(c).  The analysis under this section of the FEHA is analogous to the analysis under § 3604(c) of the FHAA.  See Walker v. City of Lakewood, 272 F.3d 1114, 1131 (9th Cir. 2001) (noting that the same standards apply for FHAA and FEHA claims).  The Court, however, will not address this claim at this time.  Instead, the Court will bifurcate this and the other state law claims, until such a time as there is a final resolution of all the federal claims.

The FHAA makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person or any person associated with that person."  42 U.S.C. § 3604(f)(2).  Under this statute, discrimination includes "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  Id. § 3604(f)(3)(b).

To make out a claim under § 3604(f)(3)(b), a plaintiff must establish that: (1) the plaintiff or his associate is handicapped; (2) the defendant knew of the handicap; (3) accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) the defendant refused to make the requested accommodation.[3]  DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua, 453 F.3d 1175, 1179 (9th Cir. 2006).  Therefore, to survive summary judgment, Plaintiffs must identify specific facts to support each of these elements.[4]

---

[3] As discussed more below, the Court finds an additional requirement relevant here, which is that the plaintiff must have actually made a request for an accommodation.  See Budnick v. Town of Carefree, 518 F.3d 1109, 1119 (9th Cir. 2008).

[4] Plaintiffs also assert a claim for violation of the California Unruh Act.  The Unruh Act provides that "[a]ny person renting, leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises."  Cal. Civ. Code § 54.1(b).  The reasonable

1

2          **1.  Visitor Parking**

3

4          Plaintiffs' first claim is based on an alleged request for a

5    reasonable accommodation from Defendants' parking policy.  Plaintiffs

6    alleged that they requested, and Defendants refused to provide, a

7    permanent parking space for use by Mary Austin's caretakers so that

8    they could provide the 24 hour care that she required.

9

10              **a.  Handicap**

11

12          The first element that Plaintiffs must establish is that Mary

13   Austin was handicapped, as defined under the statute.  Defendants do

14   not present any argument that Austin was not handicapped.  Section

15   3602(h)(1) defines a handicap as "a physical or mental impairment

16   which substantially limits one or more of such person's major life

17   activities."  42 U.S.C. § 3602(h)(1).  A physical or mental

18   impairment includes life-threatening diseases, such as cancer.  24

19   _____

20   accommodations analysis under the Unruh Act closely follows the
     analysis under § 3604(f)(3)(b) of the FHAA.  S. Cal. Hous.
21   Rights Ctr. v. Los Feliz Towers Homeowners Ass'n, 426 F.Supp.2d
     1061, 1068 (C.D. Cal. 2005).  Plaintiffs also assert a claim
22   under Cal. Gov't Code § 12927(c)(1), California's FEHA statute,
     which states that it is discrimination to "refuse to make
23   reasonable accommodations in rules, policies, practices, or
     services when these accommodations may be necessary to afford a
24   disabled person equal opportunity to use and enjoy a dwelling."
     Cal. Gov't Code § 12927(c)(1).  The analysis under this section
25   of the FEHA is analogous to the analysis under § 3604(f)(3)(b)
     of the FHAA.  See Walker, 272 F.3d at 1131.  As stated above,
26   however, the Court will not address the state law issues in
     this case until such time as the federal questions are
27   resolved.

28

C.F.R. § 100.201(a)(2).  Major life activities are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201(b).

Here, Mary Austin suffered from terminal lung cancer and, due to her chemotherapy treatments, was greatly fatigued and unable to properly care for herself.  (Robison Aff., at 2.)  Moreover, due to her condition, Mary Austin lacked energy to prepare meals for herself or handle phone calls.  (Id. at 3-4.)  Because Mary Austin's impairment substantially limited her ability to perform daily tasks, her disease qualifies as a handicap under the statute.

### b.  Knowledge

To satisfy the second element, Defendants must have known or reasonably expected to have known about the handicap.  Defendants do not dispute that Mary Austin was diagnosed with cancer or that they were aware of her condition.  (Mot., at 14.)  Therefore, it is clear under the facts presented by both parties that Defendants possessed knowledge of Austin's handicap.

### c.  Request for Accommodation

Although the elements to make out a claim for reasonable accommodations under the FHAA do not specifically state that a request, explicit or not, must to be made, applicable law suggests that some request is necessary.  See Budnick v. Town of Carefree, 518

F.3d 1109, 1119 (9th Cir. 2008) (noting that a special use application to build a senior retirement community was sufficient to constitute a request for a reasonable accommodation, even though a request was not explicitly made); Dubois, 453 F.3d at 1179 (finding that the plaintiffs submitted letters from doctors requesting an accommodation for plaintiffs, such that a sufficient request was made).  It would be impossible for a defendant to "refuse" to make an accommodation if that accommodation was never requested in the first place.  See 42 U.S.C. § 3604(f)(3)(b).

It is instructive to look to the American with Disabilities Act ("ADA"), which contains a reasonable accommodations provision similar to the one found in the FHAA.  See Giebler v. M & B Assoc., 343 F.3d 1143, 1149 (9th Cir. 2003) (noting that the provisions of the ADA are a good analogy since there is little significant difference in the rights and obligations created).  Under the ADA, courts have held that a request for an accommodation is necessary as part of the plaintiff's prima facie case.  See Vorhies v. Pioneer Mfg. Co., 906 F. Supp. 578, 581 (D. Colo. 1995); Wilder v. South E. Pub. Serv. Auth., 869 F. Supp. 409, 418 (E.D. Va. 1994).

The specificity of the request under the ADA, however, is somewhat uncertain.  For example, in the employment context, the Ninth Circuit has said that "the plaintiff in an ADA discrimination suit must be able to point to at least one specific accommodation that was available to the employer."  Barnett v. U.S. Air, Inc., 157 F.3d 744, 749 (9th Cir. 1998).  The Ninth Circuit has also said that in the absence of a specific request, an employer is required to communicate with the employee about possible accommodations only if

the employee was unable to make the specific request and the employer knows of the existence of the employee's disability.  <u>See</u> <u>Granados v. J.R. Simplot Co., Inc.</u>, 2008 WL 313056, at *1 (9th Cir. Feb. 1, 2008) (citing <u>Brown v. Lucky Stores, Inc.</u>, 246 F.3d 1182, 1188 (9th Cir. 2001)).

Here, Defendants argue that Plaintiffs never made a specific request for a reasonable accommodation from the parking policy. Defendants argue that the letter from Robison to Brown on March 27, 2007, was not a specific request because it only mentioned that some family members would be coming to care for Mary, and did not specifically ask for a designated visitor parking spot.  (Mot., at 6.)  Defendants contend that they first received a request for a parking accommodation on July 23, 2007, when the Fair Housing Council of the San Fernando Valley requested that Defendants assigning a visitor spot to Mary's caregivers.  (Reply, at 7.)

The Court agrees with Defendants that the March 27, 2007, letter does not make a specific request for an accommodation from the parking policy.  However, the Court finds that Plaintiffs have provided evidence to create a triable issue of fact regarding whether Mr. Wheeler's telephone conversation and in-person meeting with Brown on April 30 and May 1, respectively, constituted a specific request for an accommodation.  (<u>See</u> Okojie Decl., Ex. 11.)  Indeed, Plaintiffs provide evidence of a letter that Wheeler wrote recounting his conversation with Brown and requesting that the apartment complex assign a permanent parking space for Mary's caretakers.[5]  (<u>Id.</u>)  Brown

_____

[5] Defendants object to the admissibility of Wheeler's letter. However, the Court notes that inadmissible evidence can be considered

disputes accuracy of the letter's content.  (Brown Decl., at 7.)
Thus, the Court finds that there is a genuine issue of fact regarding
whether Plaintiffs made a specific request for an accommodation.

### d. Necessity

Plaintiffs must provide facts to demonstrate that the requested
accommodation of designating a parking space for Mary Austin's
caretakers was necessary to afford Mary an equal opportunity to use
and enjoy her dwelling.  To prove that an accommodation is necessary,
plaintiffs must show that, but for the accommodation, the handicapped
person likely will be denied an equal opportunity to enjoy the
housing of his or her choice.  Giebeler, 343 F.3d at 1155 (citing
Smith & Lee Assocs. v. City of Taylor, 102 F.3d 781, 795 (6th Cir.
1996)).  In other words, there must be a causal link between
Defendants' visitor parking policies at issue and Plaintiffs'
injuries; otherwise, there can be no obligation on the part of
Defendants to make reasonable accommodations.  Giebler, 343 F.3d at
1155.

Several courts have held that a parking space may be necessary
in order to provide a disabled tenant the equal opportunity to enjoy
the housing of his or her choice.  See e.g., Jankowski Lee & Assocs.
v. Cisneros, 91 F.3d 891, 895 (7th Cir. 1996); Shapiro v. Cadman

---

at the summary judgment stage so long as it "could be presented in an
admissible form at trial."  Fonseca v. Sysco Food Servs. of Ariz.,
Inc., 374 F.3d 840, 846 (9th Cir. 2004).  Here, the letter is
hearsay, but there is no reason to believe that Wheeler would not be
able to testify to the contents of his conversations at trial.

_Towers, Inc._, 51 F.3d 328, 335 (2d Cir. 1995); _Los Feliz Towers_, 426
F. Supp. 2d at 1067.  For example, in _Shapiro_, the plaintiff suffered
from multiple sclerosis, which resulted in difficulty walking,
urinary control problems, and fatigue.  51 F.3d at 330.  The
plaintiff lived in a crowded neighborhood in New York City, which
made it extremely hard to find parking.  _Id._  As a result of the long
delay in finding a parking spot, and having to walk to her building,
the plaintiff experienced numerous urinary accidents.  _Id._  The
plaintiff sought a parking spot in her apartment complex but was
denied because there were more apartments than available parking
spaces, and the complex followed a first-come, first-served policy.
_Id._ at 331.  The court found that an exception to the parking policy
was necessary for the plaintiff's use and enjoyment of her apartment
because, "without a nearby parking space, Shapiro is subjected to a
risk of injury, infection, and humiliation each time she leaves her
dwelling and each time she returns home."  _Id._ at 335.

In _California Mobile Home Park_, the Ninth Circuit considered a
situation quite similar to the one presently before the Court.  107
F.3d at 1381.  There, the plaintiff, a mother of a handicapped child,
sued the mobile home park for its refusal to waive guest parking fees
of $175, so that the daughter's caregiver could park at the complex.
_Id._  The court found that the plaintiff failed to show how the
caregiver's convenience was necessary for the disabled daughter's use
and enjoyment of the home.  _Id._  The court noted "[p]laintiff
submitted no evidence explaining why [the caregiver] could not have
parked outside of the mobile home park and still have provided
caregiver services to [her] daughter."  _Id._  Moreover, there was no

evidence that the caregiver's car was necessary to provide caregiver services to the disabled daughter.  Id.

Here, unlike California Mobile Home Park, Plaintiffs have provided evidence that a permanent parking space for Mary Austin's caretaker was necessary for Mary's continued use and enjoyment of her apartment.  Mary required a caretaker to be present in her apartment 24 hours a day to care for her.  The caretaker needed to have a car present in the event Mary had to be taken to a hospital.  (Robison Aff., at 8.)  The parties do not dispute that there was no parking available within two and a half miles of the apartment complex.  The visitor parking spaces were often occupied, which forced the caretakers to either park miles away and shuttle to the apartment complex, or violate the parking rules and risk having their cars towed.  (Id. at 7-8.)  Either way, there was a risk that the caretaker's car would not be available at the complex to take Mary to the hospital in the event that emergency care was needed.  Thus, the jury could find that a permanent visitor spot was necessary to make sure Mary received the care she required.

The Ninth Circuit has emphasized the importance of causation to the determination of whether the accommodation was necessary.  In California Mobile Home Park, the court said that "without a causal link between defendants' policy and plaintiff's injury, there can be no obligation on the part of defendants to make a reasonable accommodation."  107 F.3d at 1381.  The court distinguished the line of cases mentioned above where the courts have held that a parking space is necessary for the tenant's use and enjoyment of the apartment:

The rationale in these cases is that the handicapped person faces injury or pain by having to travel long distances from the house to the car.  In these cases causation is clear – without a parking space close to the apartment, the handicapped individual's use and enjoyment of the dwelling is diminished.  Once this link is established only then do we consider whether it is reasonable to require the manager to provide the accommodation.  By contrast, in this case, causation is one step removed.  In this case the policy is not directed at the handicapped person, it is directed at a third party.  Here, [the plaintiff] failed to show that the policy prevented a third party from being able to provide care services, or that it diminished the care she could receive.

Id.

Here, the court finds that Plaintiffs have established the causal connection between the refusal to provide a permanent parking space for the caretakers and Mary's injury.  Although causation is one step removed in this case, the facts show that the parking policy prevented Mary's caretakers from providing the care Mary needed.  Part of Mary's 24 hour prescribed care was the need to have a caregiver present who had access to a car in the case of an emergency.  (Robison Aff., at 7-8.)  Defendants' policy put this care at risk by forcing caregivers to park miles away or risk being towed when there was not any visitor parking available.  Thus, unlike

26

California Mobile Home Park, there was a direct causal connection here between Plaintiffs' injury and the parking policy.[6]

### e. Reasonableness

An accommodation is reasonable if it "imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." Giebler, 343 F.3d at 1157 (quotations omitted). In Giebler, the court noted a that there is some discrepancy regarding the burden of proving the reasonableness of the proposed accommodation. Id. at 1156. Under the Rehabilitation Act line of cases, the plaintiff bears the initial burden of producing evidence that a reasonable accommodation was possible. Id. The burden then shifts to the other party to prove that it is not reasonable. Id. Under the ADA, the burden initially rests with the plaintiff, but it must only show that the accommodation "'seems reasonable on its face.'" Id. (quoting U.S. Airways v. Barnett, 535 U.S. 391, 401 (2002)). The burden then shifts to the defendant to prove that the accommodation would cause undue hardship. Id.

---

[6] Defendants argue that another issue here is that Mary's caretakers were not registering with the front office when they parked as required by the lease agreement. Defendants contend that the registration policy is not so burdensome such that Plaintiffs could prove an exception to the policy was necessary for Mary's equal use and enjoyment of the apartment. (Reply, at 6.) While this may be true, the argument misses the point, since Plaintiffs are not arguing that they requested an exception from the registration policy; rather, Plaintiffs argue that the policy was enforced only against Mary's caretakers. (Opp'n, at 8.) Defendants dispute this contention in their Reply, but provide no evidence to the contrary. (Reply, at 6.)

Despite these slightly different formulations of the standard, the Ninth Circuit declined to resolve the discrepancy in Giebler, noting that application of either standard led to the same result in that particular case.  Id. at 1157.

Similarly, the Court finds that application of either standard would reach the same result here.  First, Plaintiff has provided evidence that a permanent parking spot for Mary's caretakers was possible.  The Sorrento Apartments had a total of 151 parking spaces for 148 senior apartments. (Brown Decl., at 2.)  In July 2007, there were five apartment vacancies, with one available parking space and two parking requests in the final stages of approval. (Id.)  Moreover, there were ten visitor and five handicapped parking spaces. (Id.)  The management certainly could have assigned one of these spaces to Mary's caretakers.  Indeed, on July 27, 2008, the day that Plaintiffs filed their complaint in this lawsuit, Defendants offered Plaintiffs permanent use of one of the available spots.  Thus, providing Plaintiffs with a permanent spot was possible and reasonable on its face.

Defendants do not rebut this charge with any convincing reason why the request was not reasonable or imposed an undue hardship.  Defendants' only argument is that parking was limited and thus it was important to maintain a regular policy. (Brown Decl., at 2.)  This is not sufficient to rebut Plaintiffs' claim.  See Giebler, 343 F.3d at 1158 (finding the accommodation reasonable because it did not impose any substantial financial risk or administrative burden); Jankowski, 91 F.3d at 891 (finding that the defendants had to make an exception to their first come, first served parking policy).

1

**f.   Refusal**

2

3       Finally, Plaintiffs must provide evidence that Defendants

4    refused their request for a reasonable accommodation to the parking

5    policy.   Dubois, 453 F.3d at 1179.   In Jankowski, the refusal was

6    clear because the defendants denied the plaintiff's application for a

7    closer parking space.   In Los Feliz Towers, whether the defendants

8    had refused to accommodate the plaintiff's need for a closer parking

9    spot survived summary judgment because instead of giving the

10   plaintiff a closer parking space, security guards brought the

11   plaintiff's car to a guest parking spot on the morning, and took it

12   back into the parking structure at night.   In Dubois, however, the

13   Ninth Circuit found that there was no refusal of the request for an

14   exemption from the "no pet policy" because the defendants granted the

15   plaintiffs a "temporary exemption" while the apartment investigated

16   what to do.

17       Here, the Court finds that Plaintiffs have provided sufficient

18   evidence to support a finding that Defendants refused their request

19   for a permanent parking space.   On multiple occasions after Wheeler

20   met with Brown to talk about the parking arrangement, Defendants

21   ticketed the cars of various caretakers for parking violations.

22   (Brown Decl., at 6.)   Furthermore, on July 16, 2007, Brown posted a

23   warning notice on Mary Austin's door stating that a caretaker's

24   vehicle parked in a visitor parking space would be towed.   (Okojie

25   Decl., Ex. 7.)   Unlike Dubois, Defendants never granted Mary's

26   caretakers any sort of temporary exemption while they investigated

27   how to handle the situation.   Thus, the evidence presented by

28

Plaintiffs is sufficient to support a finding that the request for a permanent parking space was refused.

**2.   Overnight Guest Policy**

Plaintiffs also claim that Defendants failed to make reasonable accommodations with regard to their overnight guest policies.  As undisputed by the parties, the lease for Sorrento Villas provided that the overnight guests were only allowed for a total of fourteen days of the year or seven consecutive days in any given month. Plaintiffs assert that Mary Austin required 24-hour care, which was denied on the basis of this policy.  As noted above, because Mary Austin suffered from terminal lung cancer and her condition substantially limited her ability to perform daily tasks for herself, her disease qualifies as a handicap under § 3602(h)(1). Additionally, Defendants do not dispute that that they were aware of her condition.  (Mot., at 14.)  Accordingly, the Court will address only the remaining elements necessary to establish a prima facie case against Defendants.

**a.   Request for Accommodation**

As previously discussed, Plaintiffs must make a request for an accommodation.  See Dubois, 453 F.3d at 1179.  Here, the evidence is sufficient to show that Plaintiffs made such a request.  Robison claims that she spoke with Brown in the parking lot in mid-March. (Robison Aff., at 3.)  Robison recalls asking Brown at that time

whether management would allow the guests to stay overnight, and that Brown said it would be okay. (<u>Id.</u>)  Brown disputes whether the mid-March parking lot conversation took place, thus creating a genuine issue of fact for trial.

Moreover, Robison sent Brown a letter on March 27, 2007, memorializing the parking lot conversation and stating that, due to Mary Austin's chemotherapy treatment, "some of us will be spending the night with her depending on her needs and the distance we have traveled." (Okojie Decl., Ex. 1.)  The letter also stated that Mary Austin's need for 24-hour care would last "for a few weeks." (<u>Id.</u>)  A jury could find that this constituted a request for an accommodation from the overnight rule.

Finally, there is evidence that Mr. Wheeler, the social worker from Kaiser, spoke with Brown in person and over the phone regarding the need for 24 hour care. (Okojie Decl., Ex. 11.)  At the personal meeting, Wheeler allegedly delivered to Brown a letter from Mary's doctor describing the need for 24 hour care. (<u>Id.</u>)  Brown disputes that she received this letter, thus creating another triable issue.

### b.  Necessity

Plaintiffs must also prove that the requested accommodation for overnight guests was necessary to afford Mary Austin an equal opportunity to use and enjoy her dwelling. <u>Giebeler</u>, 343 F.3d at 1155.  Here, Plaintiffs have provided sufficient evidence to show that if an exception was not made the overnight guest policy, and Mary's caretakers were not allowed to stay with her as prescribed by

the doctors, Mary would not be able to receive the care she required. The record includes multiple letters from Mary's doctors documenting the need for 24 hour care to treat Mary's symptoms from terminal lung cancer and the chemotherapy treatments.  (Okojie Decl., Ex. 4, 10, 11.)  Thus, Plaintiffs have met their burden to prove the exemption from the overnight guest rule was necessary.

### c.  Reasonableness

Under the FHAA, an accommodation is reasonable when it imposes no undue financial or administrative burdens.  Giebeler, 343 F.3d at 1157.  Here, the requested exemption from the overnight guest policy was reasonable on its face because it simply asked Defendants to refrain from enforcing the policy while Mary received her prescribed care.  Defendants have not made a showing that the requested accommodation would cause any financial hardship or be particularly burdensome.  Therefore, Plaintiffs' requested accommodation was reasonable.  See Robinson v. Gorman, 145 F. Supp. 2d 201, 206 (D. Conn. 2001) (finding that plaintiff could state a violation of the FHAA because defendants refused to permit a live-in aide in plaintiff's apartment).

### d.  Refusal

Plaintiffs must also prove that Defendants refused to make the requested accommodation.  See Dubois, 453 F.3d at 1179.  In DuBois, the apartment complex granted plaintiffs a temporary exemption while

it investigated the matter further.  <u>Id.</u>  Here, the Defendants never granted such an exemption until Plaintiffs filed this lawsuit on July 27, 2007.  In fact, despite Plaintiffs repeated statements to the Defendants that Mary required 24 hour assistance, Defendants continued to threaten her with legal action for violation of the lease.  On July 13, 2007, Defendants' attorneys sent Mary a letter informing her of multiple violations of her lease and stating that "[m]anagement will no longer tolerate continued violations of your lease agreement." (Okojie Decl., Ex. 5.)  On July 16, 2007, Brown posted a "warning notice" on Mary's door, which stated: "Continued violation of lease agreement – unauthorized people in residence . . . .  No unauthorized people in residence as of this date." (<u>Id.</u>, Ex. 7.)  Finally, on July 19, 2007, Defendants' lawyers sent Mary another notice stating that steps would be "taken to terminate the tenancy for failure to abide by the rules." (<u>Id.</u>, Ex. 9.)  The Court finds these actions sufficient to support a finding that Plaintiffs' request for an exemption from the overnight visitor rules was refused.

### E.  Rehabilitation Act

Plaintiffs further claim a violation of the Federal Rehabilitation Act.  The Rehabilitation Act states that "[n]o other qualified individual with a disability . . . shall, solely by reason of her or his disability, excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."

29 U.S.C. § 794(a).  To prove a claim under the Rehabilitation Act, a plaintiff must show that (1) he is an individual with a disability, (2) he is otherwise qualified to receive the benefit of the program, (3) he was denied the benefits of the program solely by reason of his disability, and (4) the program receives federal financial assistance.  Lovell v. Chandler, 303 F.3d 1039, 1052 (2002). Defendants argue that Plaintiffs have not provided any evidence that Mary Austin was denied benefits solely because she was disabled. (Mot., at 21.)  Plaintiffs do not contest this argument.  Indeed, Plaintiffs do not respond to Defendants' Rehabilitation Act arguments in their Opposition, suggesting they concede the point.  Thus, summary judgment is appropriate on this claim.  See Los Feliz Towers, 426 F. Supp. 2d at 1067-68.

**F.  Retaliation**

     Finally, Plaintiffs assert that Defendants have violated § 3617 of the FHAA for engaging in retaliatory actions against Plaintiffs. Section 3617 states that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" by the FHAA.  42 U.S.C. § 3617.

     Defendants do not explicitly move for summary judgment on the retaliation claim.  However, Defendants contend that the retaliation claim was not properly pled in the Complaint.  (Compl., at 11-12.)

The Court rejects this argument, however, finding that the allegation in the Complaint gives Defendants "'fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).

In light of the thorough explication of the facts in Defendants' Motion, the Court finds the retaliation claim capable of decision on summary judgment.  Since Defendants have not moved for summary judgment on this claim, however, the Court will give the parties an opportunity to address the issue before entering its decision. Therefore, Defendants are ordered to file a motion for summary judgment addressing solely this claim.

### G.  Attorney's Fees

Plaintiffs claim that they are entitled to attorney's fees if they can establish that they are the prevailing party in this suit. (Opp'n, at 25.)  To support this contention, Plaintiffs argue that they suffered from actual discrimination prior to the Defendants' "grudging granting" of the relief they sought.  (<u>Id.</u>)  Essentially, Plaintiffs assert that they are entitled to attorney's fees under the "catalyst theory," which posits that Plaintiffs are considered the prevailing party if their lawsuit leads Defendants to voluntarily change their conduct and bring about Plaintiffs' desired result. <u>Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Res.</u>, 532 U.S. 598, 601 (2001).  Section 3613(c)(2) states that "the court, in its discretion, may allow the prevailing party,

other than the United States, a reasonable attorney's fee and costs." 42 U.S.C. § 3613(c)(2).  However, this fee-shifting provision of the FHAA requires a party to secure either a judgment on the merits or a court-ordered consent decree in order to qualify as the "prevailing party."  Buckhannon, 532 U.S. at 602.  Therefore, as the Supreme Court held, the "catalyst theory" is not a permissible basis for the award of attorney's fees under the Fair Housing Act.  Id. at 610.  In other words, Plaintiffs cannot recover attorney's fees on the catalyst theory for an FHAA case simply because the lawsuit brought about a voluntary change in Defendants' conduct.  Rather, Plaintiffs must secure a judgment from the court on the merits of their claims in order to recover.  Because Plaintiffs have not succeeded on the merits or obtained an enforceable judgment from the Court at this time, the Court need not address Plaintiffs' claim for attorney's fees.

## H.  Injunctive Relief

Defendants' further claim that because Mary Austin has died, Plaintiffs' request for injunctive relief is moot.  (Reply, at 11.) The issue of permanent injunctive relief is premature at this time, given that a plaintiff has to prove a violation of the statute before injunctive relief can be considered.  See 42 U.S.C. § 3613(c)(1). Thus, summary judgment on this issue is not appropriate at this time.

///

///

///

**IV.   CONCLUSION**

Defendants' Motion for Summary Judgement is GRANTED with respect to Plaintiffs' claims for violation of 42 U.S.C. § 3604(c) and the Rehabilitation Act.  Defendants' Motion is DENIED with respect to Plaintiffs' claim for violation of the FHAA based on failure to provide reasonable accommodations.

With regard to the claim for retaliation pursuant to 42 U.S.C. § 3617, Defendants are ordered to file a motion for summary judgment on this claim by October 3, 2008.  Plaintiffs shall file their opposition by October 10, 2008.  The parties' briefs shall not exceed ten (10) pages.

IT SO ORDERED.

DATED:     September 23, 2008                          _____
                                                        STEPHEN V. WILSON
                                                        UNITED STATES DISTRICT JUDGE